# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RYAN MICHAEL PRINKEY**, | Case No. 6:16-cv-01686-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **NANCY A. BERRYHILL**, Acting Commissioner of Social Security, | |
| Defendant. | |

Kathryn Tassinari, HARDER, WELLS, BARON & MANNING, PC, 474 Willamette, Suite 200, Eugene, OR 97401. Of Attorneys for Plaintiff.

Billy J. Williams, United States Attorney, and Renata A. Gowie, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204; Lisa Goldoftas, Special Assistant United States Attorney, OFFICE OF GENERAL COUNSEL, Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Ryan Prinkey ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application

for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI")

under Title XVI of the Social Security Act. Because the Commissioner's decision is not based on the proper legal standards and the findings are not supported by substantial evidence, the decision is REVERSED and REMANDED for immediate calculation of benefits.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence means more than a mere scintilla but less than a preponderance." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

When the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment for that of the Commissioner. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193, 1196 (9th Cir. 2004). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted)). A reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Id.*; *see also Bray*, 554 F.3d at 1226.

# BACKGROUND

## A. Plaintiff's Application

Plaintiff applied for DIB and SSI on November 7, 2012. Administrative Record ("AR")
241, 243. Both applications allege disability beginning October 28, 2012, due to Ehlers-Danlos
syndrome, anxiety, fractures, knee injury, cervical spine fracture C6, C7 facet lock, liver
laceration, torn ligaments in knee, and torn rotator cuff. AR 99, 113, 131, 146. Plaintiff was born
in 1982 and was 29 years old at the date of alleged onset of his disability. AR 99. Plaintiff has a
12th grade education. AR 271. From 2009 until early 2011, Plaintiff worked full-time as a pastry
chef. AR 272. In 2012, Plaintiff worked full-time as a cook at a bar. AR 272.

The Commissioner initially denied Plaintiff's claims on July 3, 2013, and again on
reconsideration on August 22, 2013. AR 111-12, 125-26, 145, 160. Plaintiff requested a hearing
before an Administrative Law Judge ("ALJ"), which was held on October 31, 2014. AR 60, 187.
At the hearing, the ALJ heard testimony from Plaintiff and vocational expert ("VE") Steven
Cardinal. AR 31, 60-98. The ALJ issued a decision on January 15, 2015, finding Plaintiff not
disabled. AR 31-46.

Plaintiff petitioned the Appeals Council for review. AR 27. The Appeals Council denied
his petition on June 16, 2016, at which date the ALJ's decision became the final decision of the
Commissioner. AR 1. Plaintiff then sought review in this Court.

## B. The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity
by reason of any medically determinable physical or mental impairment which . . . has lasted or
can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C.
§ 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for

determining whether an applicant is disabled within the meaning of the Social Security Act."

*Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. §§ 404.1520 (DIB), 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five-step sequential process asks the following series of questions:

1. Is the claimant performing "substantial gainful activity?" 20 C.F.R.§§ 404.1520(a)(4)(i), 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2. Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3. Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4. Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§

404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.     Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c), 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566, 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

## C. The ALJ's Decision

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 28, 2012, the alleged onset date. AR 33. At step two, the ALJ found that Plaintiff had the following severe impairments:

left knee status post anterior cruciate ligament reconstruction; status post bilateral shoulder repair; end stage glenohumeral osteoarthritis bilaterally in the shoulders; subscapularis sprain;

> rotator cuff tendinitis and bursitis; thoracic spine scoliosis; status post cervical fusion; asthma; nocturnal seizure; post-traumatic stress disorder (PTSD); post concussive syndrome; cognitive disorder; major depressive disorder; and alcohol abuse.

*Id.* The ALJ found that Plaintiff's affective disorder, bipolar disorder, and history of fractures were non-severe. AR 36-37. The ALJ further concluded that there was a lack of objective evidence to substantiate the existence of Ehlers-Danlos syndrome as a medically determinable impairment. AR 36.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. AR 37-39. The ALJ next assessed Plaintiff's RFC and found that Plaintiff could perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with certain limitations. AR 39. Specifically, the ALJ found that Plaintiff (1) is able to lift or carry up to 20 pounds occasionally and can lift or carry less than ten pounds frequently; (2) is able to stand or walk for a total of about six hours and sit for a total of about six hours of an eight-hour workday, with normal breaks; (3) is limited to no more than frequent climbing of stairs or ramps; (4) must never climb ladders, ropes, or scaffolds; (5) is limited to no more than frequent balancing; (6) is limited to no more than occasional stooping; (7) must never kneel, crouch, or crawl; (8) is limited on the right to no more than frequent reaching in all directions; (9) is limited on the left to no more than occasional reaching in all directions and no more than occasional handling and fingering; (10) can understand and carry out simple instructions; (11) is limited to no more than occasional interaction with coworkers and supervisors; and (12) must not interact with the public. *Id.*

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work. AR 44. At step five, the ALJ relied on the VE's testimony to conclude that Plaintiff could

perform jobs that exist in significant numbers in the national economy, including order caller, shipping and receiving weigher, and moisture tester. AR 45. Thus, the ALJ found that Plaintiff was not disabled. *Id.*

## DISCUSSION

Plaintiff argues that the ALJ erred by: (A) failing to provide clear and convincing reasons for discounting Plaintiff's subjective symptom testimony; (B) improperly assessing the medical opinion of examining physician Scott T. Alvord, Psy.D.; and (C) improperly rejecting the lay testimony of Plaintiff's brother, Kyle Prinkey and Plaintiff's father, Ben Prinkey.

### A. Plaintiff's Symptom Testimony

Plaintiff argues that the ALJ improperly discounted his subjective symptom testimony. There is a two-step process for evaluating the credibility of a claimant's testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 503 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; [s]he

must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345-46).

The ALJ's credibility decision may be upheld overall even if not all of the ALJ's reasons for discounting the claimant's testimony are upheld. *See Batson*, 359 F.3d at 1197. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

At the administrative hearing, Plaintiff testified that he had been in a motor vehicle accident in October, 2012, in which he was ejected from the vehicle at 65 miles per hour. AR 72. He reported that he separated both shoulders, tore the ligaments in his knee, and severely injured his neck. AR 73. Years after the accident he was still suffering from "shakes, terrors, and black out spells." *Id.* Plaintiff testified that he lost 80 pounds and suffered substantial muscle atrophy. AR 73, 76. He explained that he experienced persistent weakness in his left hand. AR 684. Plaintiff described his pain as being consistently an 8-9 out of 10. AR 729. He also reported memory impairment, difficulty concentrating, difficulty completing thoughts, depression, anxiety, mood swings, panic attacks, angry outbursts, and interpersonal difficulties. AR 684, 714, 726, 762, 809, 816, 840, 875.

The ALJ did not fully credit Plaintiff's statements regarding the extent, severity, and limiting effects of his impairments. AR 40-41. The ALJ gave three reasons for discrediting Plaintiff's claimed limitations: (1) Plaintiff's activities of daily living supported a finding that

Plaintiff was capable of greater work activities than alleged; (2) Plaintiff's claimed impairments were not supported by the record; and (3) Plaintiff's conservative treatment undermined his subjective symptom testimony.

### 1. Plaintiff's Activities of Daily Living

The ALJ noted Plaintiff's ability to fix simple meals, clean his room, wash laundry, pick up dishes, feed his dog, shop in stores, ride in a car, manage his finances, play video games, and garden. AR 44. The ALJ found that Plaintiff's ability to carry out such activities "supports the conclusion that [Plaintiff], although impaired, is able to perform a host of normal daily activities. In turn, this conclusion supports a finding that [Plaintiff] is capable of work activity that accommodates his particular restrictions." *Id.*

An ALJ may invoke activities of daily living in the context of determining symptom allegation credibility in order to (1) illustrate a contradiction in previous testimony, or (2) demonstrate that the activities meet the threshold for transferable work skills. *Orn*, 495 F.3d at 639. Here, the ALJ failed to indicate which of the two grounds she was relying on. In order to show a contradiction with Plaintiff's subjective symptom testimony, the ALJ "must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284 (citing *Dodrill*, 12 F.3d at 918). Here, the ALJ failed to identify how any of Plaintiff's activities contradicted any of his testimony, so the only avenue remaining is whether Plaintiff's activities meet a threshold for transferable work skills. *Orn*, 495 F.3d at 639.

"[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v.*

*Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Here, however, the ALJ did not identify how any of Plaintiff's activities transferred to gainful work; instead, the ALJ offered a boilerplate statement that Plaintiff's activities suggested he was able to work. The ALJ's rationale is not clear and convincing given the lack of specificity in her finding. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citation omitted).

The Commissioner argues that Plaintiff's activities demonstrate that Plaintiff could pay attention and concentrate for several hours, and that he could sit, stand, and walk more than he alleged. This argument was not articulated by the ALJ, and is therefore an impermissible *post hoc* rationalization. *Bray*, 554 F.3d at 1225. Furthermore, the Commissioner failed to cite any specific statement made by Plaintiff that was contradicted by his activities. In order to discredit subjective symptom testimony, the ALJ "must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284 (citing *Dodrill*, 12 F.3d at 918). Therefore, Plaintiff's activities of daily living do not constitute a clear and convincing reason to reject his subjective symptom testimony.

### 2. Plaintiff's Conservative Treatment

The ALJ also relied on Plaintiff's alleged conservative treatment of his impairments in rejecting his symptom testimony. Conservative treatment can be "sufficient to discount a claimant's testimony regarding [the] severity of an impairment." *Parra v. Astrue,* 481 F.3d 742, 750-51 (9th Cir. 2007). Here, the ALJ found that Plaintiff refused to take Cymbalta, which was recommended by his treating provider, P.A. Tsabetsaye. AR 41. Although Plaintiff initially resisted being prescribed anti-depressants, he did so based on fears that he would become addicted. Plaintiff noted that his mother had a history of addiction to anti-anxiety medication,

and P.A. Tsabetsaye "[a]dvised [him] to continue with alternative/natural methods." AR 644.

Despite his reservations, Plaintiff was subsequently prescribed Gabapentin for nerve pain and

anxiety; however, the Gabapentin had to be discontinued because Plaintiff had an allergic

reaction to it. AR 720, 727.

The Commissioner argues that after Gabapentin, Plaintiff refused an anti-depressant,

selective serotonin reuptake inhibitor ("SSRI"); however, this assertion is not supported by the

record because Plaintiff was in fact prescribed SSRI. AR 796. Moreover, Plaintiff was also

prescribed Tizanidine and Melatonin to help with his sleep problems. AR 508, 657, 680, 692,

718, 722, 761. Viewing the record as a whole, it is clear that although Plaintiff was initially

reluctant to take prescription medication for his depression and anxiety, he ultimately agreed to

take them. Furthermore, the Ninth Circuit has criticized reliance on a lack of treatment as a basis

to reject mental health complaints, opining that "it is a questionable practice to chastise one with

a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v.

Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996). As such, Plaintiff's initial reluctance to take anti-

depressants is not a clear and convincing reason to reject his symptom testimony.

The ALJ additionally found that Plaintiff's physical therapist was unsure if Plaintiff was

doing his home exercises. AR 41. Plaintiff explained that he struggled to stay consistent with his

home exercises because of his unstable living situation. AR 855. Indeed, the record reflects that

Plaintiff was dealing with homelessness during that time period. AR 809, 828. Furthermore,

there are indications that Plaintiff's mental impairments impeded his ability to complete the

home exercises. Plaintiff expressed confusion about which exercises he was supposed to be

doing, and at that time, his memory was "erratic" and "inconsistent," he exhibited a "clouded

consciousness," and he was experiencing difficulty focusing, staying on task, and completing

thoughts. AR 796, 816, 863. Therefore, Plaintiff's alleged conservative treatment is not a clear and convincing reason to reject his subjective symptom testimony.

### 3. Lack of Objective Medical Evidence

The ALJ also discounted Plaintiff's credibility because she found that the "evidentiary record failed to support the degree of limitation alleged by [Plaintiff]." AR 40. Specifically, the ALJ found that an examination revealed well-healed incisions and x-rays from 2013 showed no abnormalities associated with the cervical fusion. *Id.* The reports that the incisions healed well and that the x-rays revealed no abnormalities are not inconsistent with Plaintiff's allegations that he was experiencing ongoing pain in his neck. When he was ejected from the vehicle in the accident, Plaintiff experienced trauma to the neck, which resulted in a disk protrusion that that caused compression of his spinal cord. AR 430, 432. The disk had to be removed and the 6th and 7th cervical vertebra were fused together with titanium plates and screws that were drilled into the bones. AR 278, 447-48. This first procedure was performed with an incision in the throat area; however, because the fusion was not entirely stable, a second surgery was performed through an incision in the back of the neck to drill additional screws into the vertebra. AR 447-49, 524. The mere fact that Plaintiff's incisions had healed and the x-rays were "normal" does not mean that Plaintiff was not experiencing pain due to his neck injury and subsequent invasive surgeries.

The ALJ also relied on Physician Assistant Jessica Tsabetsaye's chart note in June, 2013, which reported that Plaintiff's knee was "healing well." AR 40. Plaintiff suffered extensive damage to his left knee as a result of the motor vehicle accident; the knee was dislocated and both the ACL and MCL were torn, which required reconstruction and repair. AR 417 (Plaintiff "underwent ACL reconstruction, MCL primary repair with augmentation, medial meniscal repair

and LCL repair."), 328, 403, 513, 520. The reconstruction procedure required drilling holes in both the femur and the tibia. AR 421. Dr. Dr. Timothy Bollom noted that it was "likely a nine month recovery given the severity of [the] knee injury." AR 418. Although Plaintiff's knee may have initially appeared to have been "healing well," in 2014, Dr. Christopher N. Walton noted that Plaintiff's knee was unstable and an MRI revealed that the "ligament reconstruction appears abnormal with thinning of the intercondylar region" and increased swelling around the graft. AR 776, 779. Furthermore, P.A. Tsabetsaye's chart note that Plaintiff's knee was "healing well" is not inconsistent with Plaintiff's complaints of knee pain, because P.A. Tsabetsaye referred Plaintiff to a physical therapist and a neurosurgeon during that same appointment. AR 643. Additionally, Plaintiff continued to report pain in his knee over the following months and years. AR 609, 680, 684, 692, 719, 729, 776, 779, 863.

The ALJ also relied on the fact that Plaintiff's gait was normal and no motor weakness was detected. AR 40. Despite Plaintiff exhibiting a normal gait at times, providers often observed an abnormal or wobbly gait; Plaintiff also reported problems with his knee locking up, and weakness in his knee. AR 561, 572-73, 731, 779, 781, 795-96, 832, 860, 874, 876.

The ALJ additionally relied on the fact that in June, 2013, Plaintiff drove all the way from Albuquerque, New Mexico to Bend, Oregon with minimal neck pain, even though Plaintiff was not taking any pain medications at that time. AR 40. Careful review of the record reflects that although Plaintiff was not taking any prescription pain medications as of his appointment on June 28, 2013, Plaintiff had still been taking Oxycodone and Methocarbamol just a few days prior. AR 658. Moreover, Plaintiff continued to require prescription medication after this trip, because at his appointment on June 28, 2013, Dr. Brad Ward prescribed Vicodin, Hydrocodone, and Methocarbamol for Plaintiff's pain. AR 657.

The ALJ also noted that, in July, 2013, Dr. Bollom observed that Plaintiff's shoulder and knee strength were normal, and in February, 2014, an examination revealed that Plaintiff's shoulders exhibited only mildly reduced range of motion with no swelling in his extremities. AR 41. However, Plaintiff's main complaint was *pain* in his shoulders rather than weakness or inhibited range of motion. AR 658, 668, 680, 684, 714, 719, 724, 729, 779. In August 2013, Plaintiff presented with his hands shaking and reported that his shoulder was "bone to bone." AR 668. In December 2013, Plaintiff continued to experience pain in his shoulders, reporting that his pain was constantly an 8-9 out of 10. AR 729. The next month, results of a radiograph revealed that Plaintiff had end-stage osteoarthritis in both shoulders and he reported that his shoulder pain had become so severe that he could not sleep because of it. AR 682, 724. Plaintiff continued to consistently complain of shoulder pain. AR 714, 719, 779, 796, 840, 887, 890. Accordingly, Dr. Bollom's observations do not contradict Plaintiff's pain testimony.

Finally, the ALJ relied on the fact that, in November, 2013, Plaintiff was alert and organized, demonstrating normal thought content, judgment, cognition, mood, and behavior. AR 41. However, at that appointment Plaintiff was seeking treatment for a sore throat and fever, not mental health issues. AR 757. Moreover, the ALJ may not merely cherry-pick isolated inconsistencies with the objective medical record to discount a plaintiff's entire symptom testimony. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F. 3d 1195, 1205 (9th Cir. 2001)). The overall record overwhelmingly demonstrates that Plaintiff had difficulties with judgment, cognition, mood, and behavior. AR 328 (experiencing extreme mood swings), 625 (difficulty focusing), 684 (difficulty concentrating), 732 (displaying inappropriate mood and affect), 795 (continuing to struggle with "severe depression"), 796 (impaired judgment and impulse control with clouded consciousness), 816 (difficulty

concentrating, completing thoughts, focusing, and staying on task), 840 (experiencing irritability, mood swings, and recurrent bad thoughts), 877 (cognition appeared to be impaired), 878 (exhibiting significant difficulty with judgment). As such, the purported lack of medical evidence is not a clear and convincing reason to reject Plaintiff's subjective symptom testimony. Moreover, even if Plaintiff's testimony were not supported by the medical evidence, because the Court has found the other reasons provided by the ALJ are not clear and convincing, this reason, standing alone, would be insufficient. *Robbins*, 466 F.3d at 883.

**B. Medical Opinion Evidence**

Plaintiff argues that the ALJ improperly rejected the medical opinion of examining physician, Dr. Alvord. The ALJ is responsible for resolving conflicts in the medical record, including conflicting physicians' opinions. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating doctor's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).

If a treating doctor's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating doctor's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Additionally, the ALJ must accord greater weight to the opinion of an examining physician than that of a non-examining physician. *Lester*, 81 F.3d at 830. As is the case with a treating physician's opinion, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v.*

*Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). If the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester*, 81 F.3d at 830-31. Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). It is error to ignore an examining physician's medical opinion without providing reasons for doing so; an ALJ effectively rejects an opinion when he ignores it. *Smolen*, 80 F.3d at 1286.

Dr. Alvord performed an examination of Plaintiff on October 17, 2014. AR 872. Based on his examination of Plaintiff and an extensive review of Plaintiff's medical records, Dr. Alvord determined that Plaintiff suffered from a cognitive disorder due to a traumatic brain injury which had an "impact on his cerebral functioning." AR 878. Dr. Alvord further explained that Plaintiff was afflicted with impaired memory and significant difficulty with judgment, insight, and impulse control. *Id.* Dr. Alvord also determined that Plaintiff's pain symptoms, in conjunction with his cognitive problems, would "severely impact his ability to maintain extended concentration and focus." *Id.* Furthermore, Dr. Alvord concluded that Plaintiff would "struggle to perform activities within any regular [or] customary tolerances." *Id.* Dr. Alvord additionally observed that Plaintiff would be markedly limited in his ability to: perform activities within a schedule and maintain regular attendance; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal workday; and perform at a consistent pace without an unreasonable number and length of rest periods. AR 881-82.

The ALJ accorded little weight to Dr. Alvord's assessment. The ALJ provided three rationales for rejecting the doctor's opinion: (1) Dr. Alvord determined that Plaintiff's use of alcohol and marijuana were not contributory to Plaintiff's current symptoms and limitations; (2) the check-box form filled out by Dr. Alvord was not supported by his accompanying report; and (3) the degree of limitations described by Dr. Alvord was not supported by the record. AR 43.

### 1. Alcohol and marijuana use

The ALJ rejected Dr. Alvord's opinion, in part, because Dr. Alvord concluded that Plaintiff's use of alcohol and marijuana did not contribute to Plaintiff's symptoms or limitations. AR 43. The ALJ found that the medical record supports the "conclusion that [Plaintiff's] alcohol abuse is a severe impairment that adversely affects his ability to perform work-related activities." *Id.* Dr. Alvord's determinations regarding Plaintiff's use of alcohol and marijuana were uncontradicted by any other doctor; therefore, the ALJ was required to provide clear and convincing reasons to reject that opinion. *Pitzer*, 908 F.2d at 506. The ALJ, however, failed to cite any evidence in the record and failed to articulate any reason why the record supports her conclusion, rather than Dr. Alvord's. The mere fact that the ALJ disagreed with Dr. Alvord's conclusion is not a clear and convincing reason to reject his medical opinion.

The Commissioner argues that Plaintiff's use of alcohol and marijuana contributed to his symptoms. The Commissioner almost exclusively relies on evidence of Plaintiff's substance use, however, rather than evidence that such use contributed to Plaintiff's limitations. The Commissioner notes only one appointment in which a physician's assistant speculated that

Plaintiff's alcohol and marijuana[1] use could be contributing to his limitations. The Commissioner asserts that the "doctor indicated the alcohol use *probably* had an effect on his ability to sleep." Despite the Commissioner's claim, the observation was made by a physician's assistant, not a doctor; moreover, the physician's assistant merely speculated that Plaintiff's alcohol and marijuana use could "potentially" have "implications" on his sleep patterns. AR 763. Such speculation is not a clear and convincing reason for rejecting Dr. Alvord's opinion, nor was it a reason given by the ALJ. Furthermore, the record reflects that Plaintiff's alcohol and marijuana use does not cause limitations that would preclude Plaintiff's ability to maintain full-time employment. As the Commissioner notes, "[e]vidence showed alcohol abuse in conjunction with marijuana use, going back as far as 2008." Nevertheless, Plaintiff was able to work full-time from 2009-11. AR 272. As such, Plaintiff's substance use has not prevented him from working full-time. Therefore, the Commissioner's argument—that Plaintiff's substance use was determinative in producing his disabling limitations—is not supported by the record.

The ALJ also found that Dr. Alvord did not provide explanations for the answers on his check-box form. AR 43. Dr. Alvord, however, accompanied the check-box form with a detailed report explaining his findings. AR 872-83. Nevertheless, the ALJ found that although the check-box form was accompanied by the narrative report, the report only described Plaintiff's condition at one point in time and did not provide a longitudinal view of Plaintiff's mental impairments over time. AR 43. This is not a legitimate reason to reject Dr. Alvord's opinion. Even if the report only described Plaintiff's condition at one point in time, the medical opinion still provided a valid analysis of Plaintiff's condition at that particular time within the adjudicatory period.

---

[1] The Court notes that Plaintiff was prescribed a medicinal marijuana card. AR 643, 680, 720, 875.

Additionally, Dr. Alvord's opinion of Plaintiff's condition in October of 2014 is consistent with the overall trend of Plaintiff's deteriorating mental health. AR 684, 726, 729, 762, 796, 810, 816, 840, 873, 877.

The Commissioner also argues that Dr. Alvord's clinical notes contradicted his opinion that Plaintiff has marked limitations in "attention, concentration, persistence or similar." The Commissioner cites Dr. Alvord's findings that: Plaintiff's thought processes were intact, with some mild confusion; his working memory was only mildly impaired; he refused to perform serial threes or sevens; his long-term memory was somewhat impaired; he correctly performed an addition problem but not a multiplication problem; and he arrived at the examination on time.

None of the clinical notes cited by the Commissioner contradict Dr. Alvord's finding that Plaintiff has marked limitations in attention, concentration, and persistence. The Commissioner fails to explain how intact thought processes, mild confusion, mild memory impairments, and arriving to the examination on time have any bearing on Plaintiff's attention, concentration, and persistence. Moreover, several of the notes cited by the Commissioner actually *support* Dr. Alvord's findings. The fact that Plaintiff ultimately gave up prior to completion of the serial threes and sevens suggests that Plaintiff had problems with attention, concentration, and persistence. Dr. Alvord explicitly determined that such behavior was not volitional, but was "secondary to symptoms related to a history of traumatic brain injury." AR 873. The Commissioner notes that Plaintiff was able to correctly add 6 and 4; however, that ability is not inconsistent with Plaintiff's difficulties in concentration, attention, and persistence. Furthermore, Plaintiff was subsequently unable to multiply 5 by 9, and could not spell the word "world" backwards. AR 877. Therefore, the record does not support the Commissioner's assertion that Dr. Alvord's clinical notes contradicted his findings.

Finally, the ALJ found that "the degree of restrictions cited by Dr. Alvord in the narrative report is not supported in the evidentiary record. Instead, my description of [Plaintiff's] residual functional capacity has such support." AR 43. The ALJ's reasoning was improper because she merely asserted the RFC was supported by the record and Dr. Alvord's opinion was not, but she failed to cite any specific evidence. *See Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017) (evidence cannot be discredited merely because it is inconsistent with the RFC).

Although not relied on by the ALJ, the Commissioner makes several specific arguments as to how the record contradicts Dr. Alvord's opinion. The Commissioner's proposed rationales constitute impermissible *post hoc* rationalizations. *Stout v. Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (A reviewing court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." (internal citations omitted)).

Furthermore, the Commissioner's *post hoc* arguments are not supported by the record. First, the Commissioner argues that Plaintiff's statements that he could pay attention throughout a long movie, could follow written and spoken instructions relatively well, and respected authority figures contradict Dr. Alvord's findings. AR 307-08. Although Plaintiff indicated that he could pay attention to a movie, watching a movie is a passive activity, the timeframe is much shorter than a workday, and it can be done with minimal effort. Therefore, Plaintiff's ability to pay attention to a movie does not contradict Dr. Alvord's determination that Plaintiff was markedly limited in his "ability to maintain attention and concentration for extended periods" in a work setting. AR 881; *see Garrison*, 759 F.3d at 1017 (improved functioning "while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.").

Additionally, Plaintiff indicated that he was somewhat limited in his ability to follow instructions, which is not inconsistent with Dr. Alvord's determination that Plaintiff was only moderately limited in the ability to carry out short and simple instructions but was markedly limited in his ability to carry out detailed instructions. AR 307, 881. Although Plaintiff stated that he respected authority figures, Dr. Alvord did not discuss Plaintiff's respect for authority. Therefore, Plaintiff's testimony did not contradict Dr. Alvord's opinion.

The Commissioner also cites Kyle Prinkey's claims that Plaintiff could follow written and spoken instructions well and had a good attention span, arguing that such claims directly contradict Dr. Alvord's limitations regarding attention, concentration, and following instructions. AR 286, 881-83. Although Kyle Prinkey reported that Plaintiff had a good attention span and could follow instructions well, he also explained that Plaintiff needs reminders to attend his appointments and needs someone to accompany him to the appointments to "listen and remember the details." AR 284. In addition, he reported that "[s]ince the accident, [he had] noticed [Plaintiff] having a lot of trouble organizing complex and standard tasks such as to-do lists, house chores, basic hygiene, reading, writing, arithmetic, and keeping appointments." AR 329. Furthermore, Kyle Prinkey noted that when Plaintiff was asked to repeat back information that had just been conveyed to him, Plaintiff's "response was often confused, about a different topic, or had made-up details." AR 329. Several months later, Kyle Prinkey reported that Plaintiff had "lost his organization[al] skills, [had] had some memory loss and often loses items." AR 643. Despite Kyle Prinkey's general claims that Plaintiff had a good attention span and could follow instructions well, his specific descriptions of Plaintiff's abilities and limitations indicated that Plaintiff did have difficulties with following instructions and attention. Therefore,

the record supports Dr. Alvord's findings that Plaintiff is limited in his ability to follow instructions and pay attention.

The Commissioner additionally relies on several of P.A. Tsabetsaye's treatment notes; from February, May, and June of 2013, reporting that Plaintiff had intact cognitive function and was cooperative on examination. AR 644, 646, 649. The fact that Plaintiff was cooperative is not inconsistent with Dr. Alvord's findings because Dr. Alvord did not comment on Plaintiff's ability to cooperate. Although P.A. Tsabetsaye noted that Plaintiff's cognitive function was intact, this was merely a reflection based on "general" observations rather than the results of a cognitive test. AR 644, 646, 649. Furthermore, the record reflects that Plaintiff's cognitive functioning was substantially impaired. AR 410 (Plaintiff's physical therapist noted his "tangential and rambling speech"), 625 (Dr. DeCoster noted that Plaintiff had "some difficulty focusing during [their] conversation"), 684 (Plaintiff was experiencing difficulty concentrating), 729 (Plaintiff was suffering from memory loss), 762 (P.A. Darrin P. Guitreau observed that Plaintiff was "tangential" with "fairly poor insight"), 796 (MHS Carmen MacMillan observed that Plaintiff's consciousness was clouded and his memory was erratic and inconsistent), 810 (Dr. Robert Ozwoeld noted that Plaintiff's concentration and memory were impaired), 816 (Plaintiff reported difficulty concentrating, focusing, staying on task, and completing thoughts).

Finally, the Commissioner cites a single treatment note from January 2014, in which N.P. Barbara Bryson noted that Plaintiff had normal memory as well as appropriate mood and affect. AR 727. Again, the Commissioner may not merely cherry-pick isolated inconsistencies with the objective medical record to contradict a doctor's opinion. *See Garrison*, 759 F.3d at 1017. Here, the Commissioner relied on a single treatment note and ignored extensive, contemporaneous

evidence indicating Plaintiff's cognition and mental health were not normal. In December 2013, N.P. Michelle Davila noted that Plaintiff was suffering from memory impairment, depression, and anxiety. AR 731. She also observed that Plaintiff displayed inappropriate mood and affect, poor insight, and pressured speech. AR 732. On January 13, 2014, Plaintiff reported anxiety and memory impairment, and on January 17, 2014, Plaintiff reported sleep disturbances and difficulty concentrating. AR 684, 726. Dr. Ward indicated that Plaintiff was in need of psychiatric treatment. AR 684. Furthermore, on February 3, 2014, P.A. Guitreau observed that Plaintiff was quite tangential and had a "notably depressed demeanor." AR 760. Plaintiff told P.A. Guitreau that he was going through a "Freddy Krueger thing" where he fears he will be unable to wake up, so he drinks "lots of water" before bed to make sure he gets up to use the bathroom frequently, to protect himself from dying in his sleep. *Id.* Later that month N.P. Bryson observed that Plaintiff had an inappropriate mood and affect. AR 716. Therefore, contrary to the single treatment note cited by the Commissioner, the record demonstrates that around the time of January, 2014, Plaintiff was struggling with significant mental impairments, and that trend continued. Thus, the Commissioner's contention that Dr. Alvord's findings were not supported by the record lacks merit.

Additionally, Dr. Alvord's conclusions are consistent with his clinical notes and the longitudinal record. During Dr. Alvord's examination, Plaintiff endorsed anterograde and retrograde amnesia related to the motor vehicle accident. AR 874. Furthermore, Plaintiff could not name the day, date, or current season accurately. AR 877. Throughout the examination Plaintiff expressed confusion regarding the purpose of the examination and his memory scores were all below the tenth percentile. AR 873, 877. Plaintiff also informed Dr. Alvord that he often gets angry and starts yelling without knowing why. AR 875. Moreover, Dr. Walton observed that

Plaintiff was showing signs of a head injury from his motor vehicle accident, and Plaintiff was experiencing difficulties with memory. AR 887. Dr. Ozwoeld also diagnosed Plaintiff with postconcussive syndrome and noted that Plaintiff's concentration and memory were impaired. AR 807, 810. Dr. Ward indicated that Plaintiff was in need of psychiatric treatment and noted that Plaintiff had "a lot of anxiety [and] posttraumatic stress complaints." AR 657, 684. Plaintiff consistently reported significant mental health issues including: depression, trouble sleeping, trouble managing stress, memory loss, anxiety, difficulty concentrating, posttraumatic flashbacks, mood swings, compulsions, and suicidal thoughts, AR 646, 668, 684, 724, 729, 762, 809, 816, 832, 840, 874. Therefore, Dr. Alvord's opinion is well-supported by the record.

## C. Lay Testimony

Plaintiff argues that the ALJ improperly discounted Kyle and Ben Prinkey's lay opinions without providing germane reasons. "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout*, 454 F.3d at 1053. Lay witness testimony regarding a claimant's symptoms or how an impairment affects her ability to work is competent evidence. *Id.* Thus, an ALJ may not reject such testimony without comment. *Id.* In rejecting lay testimony, the ALJ need not "discuss every witness's testimony on an individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012).

In his January, 2013, third party function report, Kyle Prinkey indicated that Plaintiff has a good attention span and could follow written and spoken instructions well; however, five months later, he reported that Plaintiff "has lost his organization[al] skills, has had some memory loss and often loses items." AR 286, 643. He explained that Plaintiff needs someone to

accompany him to the physical therapist in order to "listen and remember the details." AR 284.

When Kyle Prinkey passed on a message to Plaintiff, he noted that Plaintiff "would often

misunderstand the dates, times, or implications and many times would not be able to repeat

information back to [him] within a few minutes later." AR 329. Kyle Prinkey also observed that

Plaintiff "often showed signs of deep depression, such as placid expressions on his face, long

hours alone in his room, extreme mood swings, offensive and aggressive behavior, conversations

of self-worthlessness, and abnormal yelling outbursts." AR 328.

Additionally, Ben Prinkey reported that since Plaintiff's car accident, he had been very

nervous, lacked patience, and had difficulties with problem solving and decision making.

AR 325. The ALJ discounted the lay testimony because Kyle and Ben Prinkey lacked vocational

credentials. The Commissioner concedes that this was error and that the ALJ did not provide

germane reasons to reject the statements from Kyle and Ben Prinkey.

## D. Remand

Within the Court's discretion under 42 U.S.C. § 405(g) is the "decision whether to

remand for further proceedings or for an award of benefits." *Holohan*, 246 F.3d at 1210 (citation

omitted). Although a court should generally remand to the agency for additional investigation or

explanation, a court has discretion to remand for immediate payment of benefits. *Treichler v.

Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-1100 (9th Cir. 2014). The issue turns on the

utility of further proceedings. A remand for an award of benefits is appropriate when no useful

purpose would be served by further administrative proceedings or when the record has been fully

developed and the evidence is insufficient to support the Commissioner's decision. *Id.* at 1100. A

court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence

that has been improperly rejected by the ALJ to determine if a claimant is disabled under the Act.

*Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

In the Ninth Circuit, the "credit-as-true" doctrine is "settled" and binding on this Court.

*Garrison*, 759 F.3d at 999. The United States Court of Appeals for the Ninth Circuit articulates

the rule as follows:

> The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence. If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual matters have been resolved. In conducting this review, the district court must consider whether there are inconsistencies between the claimant's testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled. Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits.

> If the district court does determine that the record has been fully developed and there are no outstanding issues left to be resolved, the district court must next consider whether the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true. Said otherwise, the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits. A district court is generally not required to exercise such discretion, however. District courts retain flexibility in determining the appropriate remedy and a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.

*Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (citations and quotation marks

omitted).

Here, the first element is met. As discussed above, the ALJ failed to provide legally sufficient reasons for rejecting evidence and her decision contained errors of law. As to the second element, the record is fully developed and further administrative proceedings would serve no useful purpose. To determine whether the record is fully developed, the court looks to whether there are "*significant factual conflicts* in the record between [the claimant's] testimony and objective medical evidence." *Treichler*, 775 F.3d at 1104 (emphasis added).

As discussed above, the inconsistencies alleged by the Commissioner are not significant factual conflicts, and in some cases are not even inconsistencies. Dr. Alvord determined that Plaintiff was markedly limited in his ability to: perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 881-82. Dr. Alvord's findings, thus demonstrate that Plaintiff would not be able to sustain work activities on a "regular and continuing basis." SSR 96-8p ("A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). These findings are consistent with Plaintiff's reports that he has difficulty completing thoughts, concentrating, focusing, and staying on task. AR 816. The findings are also consistent with Kyle Prinkey's lay testimony that Plaintiff has "a lot of trouble organizing complex and standard tasks such as to-do lists, house chores, basic hygiene, reading, writing, arithmetic, and keeping appointments." AR 329. Furthermore, Dr. Ozwoeld indicated that Plaintiff's concentration and memory were impaired, and MHS MacMillan observed that his consciousness was clouded and his memory was erratic and inconsistent. AR 796, 810.

Here, the critical question is the extent to which Plaintiff's combined impairments would interfere with his ability to sustain work activities on a "regular and continuing basis." SSR 96-8p. Plaintiff's testimony, the lay testimony, and the opinions of Plaintiff's treating providers are consistent with Dr. Alvord's findings, which demonstrate that Plaintiff would not be able to sustain work activities on a "regular and continuing basis." SSR 96-8p. Accordingly, further administrative proceedings would not serve "a useful purpose" because the "crucial questions" have been resolved. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 495-96 (9th Cir. 2015). Thus, no significant conflicts in the medical record remain. *Treichler*, 775 F.3d at 1104.

Although the Commissioner argues that the record is not fully developed because the Court has no information about Plaintiff's current condition, the Commissioner fails to cite any legal basis for such a proposition. If the Commissioner's argument were to be accepted, the Social Security administrative records would never be fully developed and the Court would no longer have discretion to remand for benefits, because there will always be a gap in time between the ALJ's decision and the Court's review. Accordingly, the record is fully developed.

As to the third element of the credit as true analysis, if the discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled based on Dr. Alvord's findings regarding Plaintiff's inability to maintain regular attendance, sustain an ordinary routine, or complete a normal workday without interruptions from psychologically based symptoms.

Where each of the credit as true factors is met, only "in rare instances" does the record as a whole leave "serious doubt as to whether the claimant is actually disabled." *Revels v. Berryhill*, --- F.3d ----, 2017 WL 4819137 at *15 n.8 (9th Cir. Oct. 26, 2017) (citing *Garrison*, 759 F.3d at 1021). This case is not one of those "rare instances." In order to establish the existence of

serious doubt, the Commissioner may not merely "repeat[] all of the arguments she has already made." *Garrison*, 759 F.3d 995, 1022 (holding that the Commissioner failed to establish serious doubt because she "[a]t no point" advanced any argument that the Court "ha[d] not already carefully considered and rejected").

Here, the Commissioner argues that serious doubt remains. However, as in *Garrison*, the Commissioner repeats the arguments that she already made which have been thoroughly evaluated and rejected by this Court. In some instances, however, the Commissioner has provided additional facts which slightly alter the prior arguments. Accordingly, the Court addresses those arguments to the extent that additional facts have been cited.

First, the Commissioner renews her argument that Plaintiff's activities contradicted Dr. Alvord's findings, citing a few additional facts; namely, Plaintiff's stated ability to garden, cook simple meals, do laundry, and clean. The Commissioner misconstrues Plaintiff's testimony. With respect to his ability to garden, Plaintiff testified that he "was planting seeds and watering them." AR 76. He also provided the following caveats: he indicated that the minimal level of activity that he engaged in "wasn't gardening" and he stated that "a 5-year-old could [do it]." *Id.* Regarding Plaintiff's purported ability to "cook" simple meals, he testified only that he could make sandwiches, pour a bowl of cereal, and heat up a can of soup. AR 304. Contrary to the Commissioner's contention that Plaintiff could do laundry and clean, Plaintiff explained that he struggled with laundry, and he could not do it without assistance. AR 76, 304. Similarly, although Plaintiff said he could do some cleaning, he requires assistance with that activity as well. AR 304. In all, such abilities are quite minimal, and are generally consistent with Dr. Alvord's findings. Therefore, the testimony does not raise serious doubt.

The Commissioner also relies on Kyle Prinkey's lay testimony that Plaintiff could cook simple meals, shop in stores, feed the dog, garden, and play video games. AR 281-87. Again, these minimal activities do not conflict with Dr. Alvord's findings or raise serious doubt about the severity of Plaintiff's symptoms. The Commissioner also relies on Kyle Prinkey's statement Plaintiff could walk a quarter mile before needing to rest for at least 5 minutes; however, this testimony is not clear, and the Commissioner fails to explain how it creates serious doubt. Moreover, the ability to walk a quarter mile is not inconsistent with the medical record. Finally, the Commissioner asserts that the lay witness reports contradicted each other, but does not identify the alleged contradictions or explain how they are cause for serious doubt.

The record as a whole reflects that Plaintiff suffers from a multitude of severe symptoms and impairments including high levels of chronic pain in his left knee, stabbing pain and end stage osteoarthritis in both shoulders, anxiety, depression, panic attacks, flash backs, and PTSD. Furthermore, Plaintiff suffered a traumatic brain injury resulting in postconcussive syndrome, clouded consciousness, impaired judgment, concentration problems, memory impairments, amnesia, and cognitive deficiencies. Therefore, considering the record as a whole, the Court has no serious doubt that Plaintiff is disabled. *See Garrison*, 759 F.3d at 1015, 1023.

## CONCLUSION

The decision of the Commissioner is REVERSED and this matter is REMANDED for the immediate calculation and award of benefits.

IT IS SO ORDERED.

DATED this 26th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge